May it please the court. I'm Lucian Gilliam. I have the pleasure of representing the plaintiff appellate Steve Curtis in an appeal of a grant of summary judgment on an FMLA case. Below, summary judgment was granted on the grounds of there not being a serious health condition because my client had not seen a physician within seven days. We have three points for appeal. One is that there was an interference with his FMLA rights during the certification process when he was entitled to provisional FMLA leave. The next was that regardless of whether or not he had a serious health condition, there was a retaliation claim that was viable. Third, we're arguing that he did have a serious health condition. Now Mr. Gilliam, you were counsel of record in Johnson vs. Wheeling Machine Products. I was. Our court, our opinion took great, made some effort to standardize the labeling of FMLA claims, and then you walk in in this case and do the same labeling we didn't like in the other case. You know, are you just simply wed to your own way regardless of what we do, what we'd like to do? No sir. Put your claims in the language of Wheeling. Interference is not one of the claims we recognize. We've spent a lot of time trying to figure out how you label these FMLA claims. Well, I believe it's... You just don't pay attention, and it's frustrating. Well, I believe you call it an entitlement claim, sir, is what we call it. But in any event, going... Why don't you label them? All right, so which is the entitlement claim and which is the discrimination claim? Well, on the entitlement claim, the two arguments would be that the first one I mentioned would be the violations during the certification process. That would be violations of 305 and 307. The other would be on the serious health condition. Then the discrimination claim would be... Now wait a minute. Serious health condition is a precursor or an element of both an entitlement and a discrimination claim, right? It's not a separate cause of action. Serious health condition. I'm sorry, I didn't understand your question. Your first issue is to argue that he had a serious health condition. Okay, but that's not related to... What claim are we relating that to? I see. Okay, I'm sorry, sir. On serious health condition, that would be more related to the issue of the entitlement claim. What is the entitlement that you're claiming? All right, well, my client had submitted a health care provider certification that they had given him to take to his physician, Dr. Gwinn. When he brought it in, he was limping but able to walk and the health care provider... What is the benefit that he didn't get? Well, the benefit that he didn't... You're just talking process. I'm asking what the claim is. Well, the benefit that he didn't get, sir, is that when you are asked to go through this second opinion process, you're provisionally entitled to FMLA leave. And in the event that your need for FMLA leave is confirmed by the second opinion, then you're considered to have a serious health condition and you were entitled to FMLA leave. If there's a dispute, you go to the third opinion. And basically, whoever the third opinion goes with is going to come out the winner of this serious health condition issue. And either he'll be entitled to FMLA leave or he won't, depending on what these second and third opinions do. Now, the issue... So when they asked him to go on do this second opinion, he was provisionally entitled to FMLA leave under the certification. Now, what they did was they called him up the day before they wanted him to go to the physician and told him that they wanted to go to a physician in Memphis. He lived in Mountain Home, which is a kind of a highly remote area. So the entitlement claim has nothing to do with his termination? Well, no, it does have to do with his termination. Well, how? Well, if he had been... If the second opinion had said he should get FMLA leave, he would have been on FMLA leave. He would not have been terminated. But wait a minute, he was terminated for what he did before he filed for FMLA leave? Well, what he was terminated for... I mean, their write-up of the discipline is at page 73 of the appendix. And it talks about Mr. Curtis basically having been asked to go get a second opinion and refusing to do so, and that that was insubordination and job abandonment. So I think that does have to do with his termination. Because had he gone, I don't think there's any dispute in Ms. Crane's testimony that had he gone to the second opinion physician, that he wouldn't have been getting terminated over some sort of insubordination or refusal to go to Memphis to see this physician. It says Steve's refusal to take the required steps to maintain his employment status after being directly informed of the consequences of his refusal constitutes insubordination and job abandonment. In any event, I mean, that's when they fired him, is when he refused to do that. Now, the thing is, is that going to see that physician, you can't... I thought they said separate notices. One is your FMLA claim is denied because you didn't go to, you didn't show for the second opinion. Separately was a notice of termination for not, for missing, for being absent four days without FMLA, without any permission or FMLA leave even applied for. Have I got the facts wrong? Well, they may have sent him... Hold on just a second. I mean, they did deny his FMLA leave, yes. I mean, that's correct. But didn't they also terminate him because he had four days of unexcused absences before he even asked for FMLA leave? Well, I think they're also saying that... Isn't that alone sufficient to terminate him? Well, according to their write-up, what they say is that upon his return from work, Steve did not provide any documentation from a doctor showing that he was seen, treated, or excused from work for the days he missed. NUCOR's attendance policy requires a valid doctor's excuse when a teammate misses work or the absences will be considered unexcused and subject to the teammate, subject the teammate to discipline under the policy. So I don't think it's clear that he would have been fired had he gone to the physician for the second opinion. No, the reference is there was no doctor's note before the four days he missed, the first, the first work days after the hunting injury. Well, I mean, he didn't... He didn't go to a doctor till the week after that. Well, he did bring in a doctor's note. When? It was after the 28th. Yeah, we're talking about the 22nd through the 25th. Right. Now, one thing about it is, and that's where we get into this issue of clarification. Now, it's disputed, but Kelly Crane did say that on clarification on this doctor's note that they considered that they wanted clarification. And, you know, a lot of times these doctors, you know, filling out a FMLA paperwork is not their favorite part of their job. And they'll, you know, they go through and do them very quickly. You know, I don't think there's any, you know, had he been given the opportunity to go get clarification, had he been informed your doctor's note,  release you from prior to 1028, he could have gone back to the physician and got him to work the release back. Is there a document or anything in the record where Mr. Curtis claimed that, claimed FMLA leave for the 22nd through the 25th, if I've got the date, the four days before he saw a doctor? Well, he was... Where was their notice to the employer that that was, that that was an FMLA leave being claimed? Well, the first thing is that my client called in on the Monday after he had the accident on a Saturday, called in on, I think, the 21st, which is Monday, and told them what had happened, that he was having trouble seeing a physician, that he hadn't been able to go see a specialist down in Little Rock. Is there anything in the record that the acronym FMLA was even in that conversation? I don't think that he said the words FMLA, no, sir. Although, on the other hand, under 303 with an unexpected absence, you're not required to specifically name the FMLA by name. No, but you have to, you have to have, the employer has to have noticed that FMLA is in the works. They've got a policy that says it unexcused absence without a doctor's notice, you're in trouble. And so he's calling about, you know, I'm not gonna be there, and what about a doctor's note? I think they, you know, in Jamila Phillips versus Matthews, which was one of my cases from quite some time back, you know, when the employer gave the employee health care provider certification in FMLA paperwork, the court basically said, look, if you're doing that, then you clearly have a pretty good idea that this is, may be FMLA related, which is what the standard is under 303. So they were giving FMLA paperwork. I think they knew that it might be FMLA related. I'm gonna reserve the rest of my time. Thank you. Mr. Bennett. Thank you very much, your honors. And may it please the court, first to answer some of the questions that have come out. It is uniform in the record that 1028.13 is the first date that any sort of notice or leave request is made. I would just cite the court to the following pages of the appendix. It would be appendix 95, which is Dr. Gwinn's first notice. It's dated 1028.13. Dr. Gwinn's certification begins at appendix 99, but on page 100, he specifically asked, approximate date condition commenced, and he says 1028. And then new course form actually asks him to estimate the beginning date for his period of incapacity. And this is at appendix 101, and he handwrites in 1028. And then Mr. Curtis himself, we provide him a notice of eligibility that he actually gets and that he fills out that also has the 1028 date on it. His signature is found on appendix 96. Two lines above his signature, there's a line that says leave requested to begin on, and the line is 1028.13. And so there is no question and certainly no genuine issue of material fact as to whether there was some request or granting or doctor certification or notice that his four days were excused in some way or that he was incapacitated in any way. And then to go to the termination notices and the FMLA denials, those are in fact two very separate documents. One is found at appendix 73. That's the internal disciplinary notification which only relies on the failure to provide a note and the breach of the attendance policy for the four days before the leave started. That's clear on that. Then to Judge Loken's observation, which is completely consistent with the record, there's a second and separate appendix page at 103, which is simply the denial of the FMLA leave, which was properly denied for the refusal to appear for the second opinion. So I think that that squares away the record basis for the questions that were initially asked. And Judge Holmes's decision is a very straightforward application of settled law to largely admitted facts. I'm confused by why so much time was spent by the district court on serious health condition if the termination was valid anyway. Well, you know, maybe you would just say that that means that there's no harm no foul on it, which is part of the doctrine of the FMLA, of course, to say that you can't complain about things. And the first count that was presented in the complaint is definitely, am I entitled to this? And I think the district court looked at that and said, well, there's two ways you can be entitled to FMLA leave for a serious health condition. One is, is it an acute condition? You have to go to the doctor within seven days and there's a, you know, clear admission that he didn't do that. So it's clearly not acute. And then there's a chronic and his doctor was asked, is this the type of thing that's going to require two treatments a year? And he says no to that. So, you know, in defense of the district court going through that, I think that the court also looked at those facts, applied to settled law, and said, well, there's no entitlement. That then takes... That's at best the layering of his arguments, right? Oh, yes, completely. Because it's sufficient to say the four unexcused absences justify... Absolutely. This court has Burakawa and Malloy, the other cases that we cite, say specifically that you don't get any more rights to employment under the FMLA than you would have under the normal policies that exist. And I think that that is definitely layering. And it's the answer to all of the even potential retaliation questions that exist in this instance. But, of course, a premise of the retaliation claim is that you are actually exercising rights you had. And the district court properly found that there was no material issue effect on that as well. What about the refusal to attend the appointment that was set up by NUCOR? Is that common? It seems to have some validity to his concern that he's given a day notice without an opportunity to reschedule or do another time or another place. Is that common practice that it's that short notice? I don't believe that that is common practice, and I don't believe the that either way except to say that the Memphis area is commonly used for this plant, which is close by Memphis. I have an answer to that, of course, is as I believe you know the FMLA does put certain time limits on certain things and there is no requirement that the second opinion be at some length of time out. And the second opinion idea is premised on the proposition that the employee is out of work. So because the first... you get the second opinion if you have the first opinion, and therefore the employer knows that he is not needing to be at work and can go up there. And then under the undisputed facts of this case, your honor, it is not that they said good, you know, good news for you, we have a cancellation, we can get you in to Dr. Jones tomorrow, and that's great, and the other two groups didn't have appointments, and you say it's a serious health condition. His response to that in his own notes that were produced in the case, his response to that is, I told Kelly, who's our HR person, that this was not a work-related incident, but a private injury, and I didn't feel I needed to go to another doctor after seeing Dr. Gwinn. So there's no record evidence of him actually saying I would do this tomorrow, but I'm not going to do it today. He said repeatedly, and in his deposition, that his, and this is appendix 356, I told Kelly that this was not a work-related incident, but a private injury. And so you have a person who has no, and this goes also to the harm issue, I mean, you have a person who has no, even prior certification for the four days that he was terminated for, you have a person who is not going to the doctor within nine days, but claiming it's a serious health condition, he doesn't want to go to the doctor again, even though under the rules you have to go twice within that first period of time to be considered acute. And we make an appointment for him at a place that other people have gone, and that only two people went to in the last five years, and his complaint is that because it's not work-related, he shouldn't have to do that. And so that's undisputed record evidence out of his own mouth about the exchange. Now, if a case presented that didn't have a person lawfully terminated for a violation of that, the plaintiff actually had a certification for those four days, which he does not have, and if that plaintiff said to the employer, oh, well, I can't go today even though I'm off work, but I will go tomorrow, that's not this case. This is a case where his response was, I am not going to go because it was a private injury, and I don't need to go see another doctor. In her testimony, Ms. Crane's testimony is unequivocal at page A84 from her deposition, where he said, I'm not going. He testified under oath at A64. I told them I couldn't make it, period. That's his own sworn testimony. And so we don't have a situation here where he actually said, oh, Dr. Jones is great. Thank you for getting me in. Can you call back and see about tomorrow? That's just not this  It's a very clear record, actually, because both sides moved for summary judgment, and the key passages that the district court relied on are essentially plaintiff's own statement of facts, which begin at Appendix 473. Plaintiff's response to our statement of fact, where he admits away, which is at A639, where he admits away no entitlement. He acknowledges that he was terminated for missing the four days and under the employment policy. There is no harm. There is no retaliation. And the record is crystal clear on that. I believe the district court's decision is a straightforward application of settled law to admitted facts and medical records and should be affirmed. What was the first medical opinion? The first medical opinion was Appendix 95, Your Honor. Not a certification. This is the letter that was delivered to the plant. That was on 10-28-13. It's Appendix 95. Okay, that's Dr. Ginn. That's Dr. Ginn. And then the next certification that came in was received by Nucor on 11-4, which is admitted in the statement of facts, and signed by Dr. Ginn on 10-31. And that's the one where Dr. Ginn, in his own handwriting, twice says it's 10-28-13. Oh, no, no. I was getting at where... So Nucor never made a determination that he had no serious health conditions. We had made a determination that we met the reg that said we had serious doubts about the validity of it, and therefore asked him to go to the second opinion. As opposed to having... I mean, there was not a company doctor who looked at Dr. Ginn's and said this is over. No. With a picture of him walking to his car and saying this doesn't add up. Yeah, well, Ms. Crane, who's our HR person, was, as a layperson, I think, able to make that judgment call. And what she testified to and explained was... What all Nucor did was say we need to look harder at this. We will not accept Dr. Ginn's no use of the left leg on his face. While he's walking on two feet. Exactly. And she did do that, and therefore we asked for the second opinion. But the critical fact for the dispositive thing that cuts through all of this is that even Dr. Ginn's certification starts four days after he had all those unexcused absences. Yeah, it's interesting. Why go through the FMLA process when you had the independent basis to discharge him? I think that the record evidence is that there were requests made repeatedly to update and provide that. And the HR person, you know, he misses a day and he says that he's hurt. And she says, well, you need to get this or you could be fired for your attendance violation. And he never cured that. So I thought he could have cured it, but never did. I don't, you know, that's not a situation that we were presented with, but let's say that he doesn't show up. Let's say that some point in time he got a note that said, I am satisfied as a physician that he was actually hurt on the 23rd and was incapacitated on the 23rd. That's a totally different case than the one that we're presented with here. Or interestingly, he claims incapacity on the 28th, drags his deer back to the blind, drives three hours back home, goes to the doctor, you know, nine days later. He drives three hours both ways, walks in and does it. There is no certification that during those first four day period by any physician that he was incapacitated in any way. I think that's fatal to his claim. The seven day, it's undisputed that he didn't see a physician within seven days. Is it your position that it's over then? Well, it is over then as to trying to invoke that. I think that what the Department of Labor did and what the cases say is what the FMLA did was try to put some objectivity around these judgment calls so that it's not totally subjective. And so the premise of FMLA leave is a serious injury or illness, and therefore the agency made a determination and through, you know, the deducted regulations that said, well, if it's serious enough, you're going to see the doctor within seven days. And it says that in the regulation. And if you're going to go under acute, you have to do that because there's two ways you can get acute FMLA leave. Both of them require you go see the doctor in seven days. I think what the agency was doing there and made a clear rule on is saying, okay, this is an acute injury, meaning you've had it, it's severe, it's important. You're going to go to the doctor once in the first seven days, you got plenty of time to do it. So that is fatal to the acute. Now there is a chronic pregnancy of this different section, and then there's a chronic section. He can't be under that because his own physician checked a box that said he doesn't meet that. So that just eliminates the acute, being able to prove up. Exactly, exactly. And I think that what the agency was doing is giving you some wiggle room because theoretically, if you have a serious acute injury, most people are going to go to a clinic or an ER. And note that it is undisputed, and Mr. Curtis actually says this, that when he called in, the HR department said to him, you can go to your doctor if you want to, but there's a walk-in clinic that we have referred you to that you can go to and you don't even need an appointment for. And there's of course urgent care and even ER if you had to. It's such a cutoff when, in other parts of the regulation, it seems to be within 30 days, unless something unusual or extraordinary circumstances, but the seven-day limit seems to be just sort of set. I think that it is, and I think you have to look at what it's trying to accomplish. And I think what it's trying to accomplish is what is a serious acute injury. And therefore, since it has to be a serious and acute injury, the regulators said we're giving you a cushion. So you would say, if you suffered a serious and acute injury, one that incapacitated you from doing your job, I think the regulation and the statute and the rules would contemplate that, well, you have seven days to at least go see a nurse practitioner or clinic or do something. Otherwise, you may have to show you have a chronic problem. Or otherwise, maybe if it gets worse, you just have to start your leave later, which, you know, he was trying to do here by starting his leave on 10-28, even though now he's claiming he was hurt on 10-23, but he never went to a doctor. So I think it makes sense, actually, when you look at it. And of course, there's no business day requirement in that. Thank you very much, Your Honors. Thank you, Counsel. Mr. Gillum for Ebola. All right. Thank you. In his deposition testimony, my client indicated that part of the reason that he didn't want to go to Memphis was that he and his wife have a child together, that he was responsible for taking to school, and that his wife had prior work obligations. And that was one of the stumbling blocks for going there. In any event, I don't think they could legitimately require him to go beyond normal commuting distance. I don't think they could legitimately require him to go to physicians that they regularly deal with. So, regardless of why he... What was his commuting distance? His commuting distance, he had... The issue was that he had two homes. One home was very close to the facility. The other was in Mountain Home. He had a four day on, four day off work schedule. And so, basically, four days he's working, he goes and lives in Blytheville, which is in northeast Arkansas near the border with Missouri. The other four days, he lives at home in Mountain Home with his wife and child. And because he had been off work, he was in Mountain Home. And he just didn't... It was an issue to go... It's a really hilly, two lane road area from Mountain Home till after Jonesboro. It takes about three and a half hours to get to Memphis from there. And so, it was gonna leave him in a jam with respect to his children. In any event, that was part of the normal commuting distance. How far is Mountain Home to the work spot? To the work spot, it'd be about a similar distance. It'd be similar to going to Memphis from Mountain Home to his normal work spot. And I think normally, probably the closer area, if you're looking for a specialist or something like that to send him to, would probably be Jonesboro, which would probably cut an hour, hour and a half off the trip. And there might be somebody in Mountain Home, I'm not sure. Does the record show whether he lived at the home near the Nucor's facility when he was four days on? Yes, sir, it does. Yes, sir. So, his decision after the hunting injury to go to Mountain Home, it's fair to infer that he knew he wasn't gonna go to work next week, or he'd have gone to the other home? Or is the record silent on that? Well, in terms of the hunting injury, that happened on a Saturday, he was not scheduled to work until Tuesday. And so, I think he returned from Pine Bluff to Mountain Home on that Saturday. I think he didn't really... No, well, it says he returned home on the 20th. Okay, well, then the 20th, which would be the Sunday. So, he was now within 48 hours, maybe 36 hours of going to work, and he chooses to go to the home where he doesn't live when he's working. Well, that's where he stays when he's not working, is Mountain Home. I mean, that's the normal place for him to be when he is not on the job, is Mountain Home. No, but you just said when four days on... Four days on, four days off. He goes to the other home. Right. Yes, sir. So, I would have thought if he was interested in maintaining his work, he would have gone to the other home and then seen a doctor near the facility on Monday. Well, I think the issue was that he thought... He had some leftover anti inflammatories. I think the issue is that he had initially thought that it would probably just get better on its own, and by that Monday, which was the 21st, he realized it wasn't doing it, and that's when he called in. And he'd commute from Mountain Home. Well, he was at Mountain Home when he made that call, sir, if that's what you're asking. Well, I know, but if he was thinking, I don't need a doctor, because it's gonna get better on Monday, and he goes to Mountain Home, then that tells me Mountain Home was his commuting distance. You said... No, no. You said it was beyond... No, his commuting distance. I imagine what he would do is leave the night before and go stay, spend the night at Blytheville, or the afternoon before, and spend the night at Blytheville. Well, I think your commuting argument to me doesn't add up, but okay, I understand it. I'm sorry, sir. Thank you. Thank you, counsel. The case has been fairly briefed and argued, and we'll take it under advisement.